Mr. Justice Smith
delivered the opinion of the court.
This cause comes before us upon a writ of error to the circuit court of Warren county.
Questions of a highly interesting character, and of deep importance to the criminal jurisprudence of this state, are presented by the record, and require the decision of this court.
In the examination of the principles involved in this case, the desire to arrive at true results, has been powerfully stimulated by the conviction, that upon the conclusion to which I have come, depends not only the fate of the unfortunate man now in charge of the court; but to some extent, at least, the repose and well being of this community.
In the examination of the different topics discussed by the counsel, I shall pursue as most convenient, the order in which they were presented.
But before I proceed to investigate the correctness of the position assumed first by the counsel for the plaintiff, it may be ne *167 cessary to notice an objection made by counsel for the prosecution, that the first point relied on by the plaintiff, cannot come 'before the court in such a shape as to admit of decision.
No questions can bei adjudicated by an appellate court which were not subjects of decision in the inferior court; or which do not appear upon the record in a proper and tangible form. In the record, will be found a motion for the discharge of the prisoner under the 14th section of the act in relation to the writ of habeas corpus, with the reasons which were filed, and the judgment of the court overruling the said motion. There does not appear a bill of exceptions to have been taken to the opinion of the court, on the motion which would have embodied the evidence adduced in support of the application, and spread it upon the record, to be adjudged of by this court. Admitting the motion itself with the judgment thereon to be correctly upon the record, or rather to constitute a part of it, what appears from the record to invalidate the decision, or to show it erroneous? It is very true, the reasons manifestly brought the case within- the 14th section of the habeas corpus act; but there appears no evidence by which they are sustained.
The judgment of every court of competent jurisdiction must be holden to be correct, unless by the record itself the error, is made manifest. The court would be presumed to be cognisant of the fact that the prisoner was remanded to jail on the 15th February, 1833, and that the court was not held for the two succeeding stated terms thereof. But it by no means follows that the judge before whom the motion was made, knew as without proof of the fact, that the prisoner in the mean time remained in custody of the sheriff. Admitting that the prisoner had a right to demand a discharge upon a showing that he had been imprisoned for two stated terms of the court, without having been prosecuted by indictment and trial; would it not, if the court refused the application for a discharge of the prisoner, be presumed that there was no evidence before the court to support the application? or that the contrary was established? And this presumption exists in favor of every judgment of a court, that it is correct. Were the evidence in support of the application, that by which alone the correctness of the decision could be tried, is not before us. This *168 question, therefore, is not properly before this court. But as it is one of deep interest and great importance, demanding an early decision, I will proceed to give what I conceive to be the legitimate construction of the law out of which this question springs.
The habeas corpus act, in every particular, is of a highly remedial character, and is to be construed, like all other statutes of the same description, with a view to the advancement or furtherance of the objects of its enactment. It is, however, contended, though acknowledged to be of this character, that it is in language so clear and distinct as to be susceptible of deriving no aid from constructions as to what were the objects of the legislature, that it has fixed the limit of imprisonment when there is no delay or default on the .part of the prisoner; and in language clear, unambiguous and impartial, has declared, that unless the default is on the part of the prisoner, he shall be discharged from imprisonment. To this interpretation I cannot assent. Can that act be so clear, distinct and unambiguous, whose construction has been mooted in almost every court in the state, and upon which there is the greatest diversity of opinion?
The question raised in this case, and which has been discussed with great ingenuity by the counsel; and which in its decision necessarily involves the construction of this act, is this; was the prisoner, who, having been held in confinement, upon a charge of being accessory to murder, from the special term, in February, 1833, to February, 1834, the two intermediate stated terms of the circuit court for Warren county having failed, entitled to a discharge upon the ground that he was prosecuted by indictment and trial, at the next second stated term, November, previous thereto?
All laws are obligatory, only in the sense in which, by the law making power, they are intended to operate. And if courts of justice, in exploring by the first rules of interpretation, the intentions of the legislature, arrive at an interpretation of a law different from its verbal import, which construction will, be enforced by them? But here there will be no necessity to carry the construction beyond what may be considered the common-sense meaning, and legal import of the records of the section.
*169 . What object in view had the legislature, in the passage of this law? What evil did they intend to suppress — what remedy supply? It cannot be doubted but that the object of the legislature was to guard the personal liberty of the citizen, by throwing around it this additional protection against oppressive and unnecessary delays in the prosecution of persons charged and imprisoned.
It established a rule for expediting state prosecutions, by providing for the discharge of the prisoner, where the default at the second term shall be on the part of the state. The language, of the statute, I think, shows that in order to entitle the prisoner- to a discharge, the state must have been in default.
Can this presumption arise on the part of the state, when there has been no term of the court holden? The fact whether the-term has been holden or not, is wholly beyond the power of the state; in no way subject to its control. Not so the prosecution; and the witnesses over which the law presumes the state to have complete command. It is provided that the court shall, on the last day of the first stated term, admit the prisoner to bail, &c.; and it is evident, that the law contemplated the actual holding of a court; for how could the court be required to admit to bail, when no court was in session?
The technical meaning of the word term is relied upon, to show that the legislature meant that the prisoner should be tried, at all events, at the time designated’for holding the second stated term. This word is used not only to designate the time appointed for holding court, but to convey the idea of a court actually held, or in session. Thus in section 5, page 10, Revised Code, the word term is used to designate the time appointed for holding the court. But in the 14th section of the habeas corpus act, it evidently means .a term at which a court was holden; otherwise, the provision requiring. the enlargement of the prisoner, if he shall be prosecuted by indictment and trial, at or before the stated term, on the last day of the term,' would be absurd and unintelligible. This meaning must also be applied to the second member of the section, where the same words are used in the same combination. 1st. The interpretation here given to this statute, is sustained by an authority in 1 M’ Cord’s Reports, 154. The case there arose *170 under the habeas corpus act of South Carolina, which, in substance, in this particular, is very similar to our own. It was there held, “ that it was the unquestionable intent of the act to require the state to bring the prosecution to trial on the first or second term, or else the prisoner shall be discharged.- In other words, the trial must not be in default for two terms.” In that case the prisoner demanded his trial at the first term and was tried; but a mistrial ensued. The court held, “ that the state committed no default; the mistrial being a misfortune, attributable neither to the state nor to the defendant. The court and jury were equally for both parties, and both were ready at the court, and the trial had.
At the second term, the state was not ready. And there was the first default; “and the prisoner, under the terms of the act, might demand to be bailed; and if the state should not be ready at another term, then to be discharged.” In the case now before the court, the state committed no default. The holding of the court did not depend upon the state. The state can indict and try when there is a term of a court; but the holding of a court is not more within the power of the state than of the prisoner.
The case read to the court from 1 Steward, 31, does not decide directly the question here involved, although broad enough to embrace the case here presented. In that case, there were two terms of the court actually held, so that the state was twice in default. But I regard this authority as of no weight, however highly respectable some of the decisions of the supreme court of that state unquestionably are. No reason is assigned for the construction given to the act upon which the question arose, except that the act was too plain and unequivocal, to derive any aid from considering what might be the views of the legislature. And further, it was contended, that as a necessary incident of a discharge under this act, the prisoner would be thereafter forever free from prosecution for the same offence.
I am compelled to dissent from this proposition. What was the intention of the legislature? Was it to establish an act of limitations for the prosecution of felonies, or to lay down a rule to expedite state prosecutions, the better to preserve the liberties of the citizen? This act constitutes a component part of a system of *171 laws adopted at the same time; and which to some extent,for the purposes of construction at least, must be regarded as the same act. It must then he construed with direct reference to the other provisions of the other portions of the law, having relation to the same subject. But there is no confliction between this question and any other portions of the law. An effect cannot be given to words beyond their obvious meaning, unless it be necessary to effectuate the intentions of the legislature.
What then is the intent of its application? The language is, that “ if such prisoner be not prosecuted by indictment and trial, at the second stated term, or some special term prior thereto, of the court where the offence is properly cognisable, he or she shall be discharged from further imprisonment, in all cases whatever, unless the delay was occasioned by the default, or on the application of the prisoner.” The utmost extent to which this law can be carried, considered, too, as remedial, is to a total discharge from imprisonment, for the same offence; and cannot go to bar a prosecution for the crime charged. But if, by any process of reasoning, such a construction could be maintained, it would operate as a repeal of the 52d section of the statute in relation to crimes and misdemeanors, by which the limitation in prosecutions for criminal offences is established.
A discharge upon motion under this section, can have no greater effect than a discharge for the same cause upon a writ of habeas corpus, which only goes to free the prisoner from imprisonment, for the same cause, unless by the order of a court of competent jurisdiction, he shall be ordered into custody. See Revised Code, page 223, section 8. Upon this point there can be no reasonable doubt entertained.
2. The second question is, does the caption of the indictment show with sufficient certainty that the grand jurors, who found the indictment, were of the county of Warren? By the common law, every man was entitled to a trial by his peers; which peers were good and lawful men of the county in which the offence was charged. This principle of the common law is recognised and established by the constitution of this state; and the right thus secured should be beyond legislative action. It should appear, then, with reasonable certainty in the caption of the *172 indictment, that the grand jurors empannelled and sworn to inquire of, and presentment make, of the guilt or innocence of the party, charged, were of the proper county. And if it does not, it will be a fatal defect.
The caption of the indictment in this case, is in the following words, to wit: “The grand jurors of the state of Mississippi, empannelled and sworn in and for the county of Warren,” &c. The grand jury is constituted to inquire, pn the part of the state into the commission of felonies, &c., in tfieir county. The grand jury of any county may, therefore, with strict legal correctness, be styled the grand jurors of the state of Mississippi. And when the words are added, that they “ were empannelled and sworn in and for the body of the county,” it appears with that degree of certainty required in indictments, that they were of the county for. which they are sworn. This legal certainty, so far, at least, as the prisoner’s safety is involved, is stengthened by the presumption that the court could not issue a venire to any other county in the state; and that it could have issued to summon only the householders and freeholders of the county. Courts of justice are disposed to release the rigor of the ancient forms, when no injury can possibly result to the liabilities or rights of the accused.
Under the process of summoning and drawing the grand jury, the accused can always ascertain whether the persons drawn are good and lawful men of the county, by referring to the list which the clerk is required to keep of those from whom the grand jury must be drawn. See Acts of November Session, 1830, page 25. I am therefore of opinion, that, in this respect, there is no error.
3. The third question presented to the consideration of this court, is, whether the indictment is not defective, inasmuch as it does not appear that the slave Daniel was legally tried and convicted by a ■ court of competent jurisdiction. This question is again raised, by the bill of exception, to the opinion of the judge, admitting the record of the trial and conviction of the said Daniel to be read as evidence on the trial of the prisoner.
I will consider the question as arising on the admissibility of the record to the jury.
The slave Daniel, who was the property of Joel Cameron, of *173 whose murder he stood charged, was tried by the county court, prior to the adoption of the amended constitution, and convicted of the murder of the said Cameron; and received the judgment of the court.
The record of the trial, conviction and sentence of the said Daniel, was offered to the jury as evidence of his guilt, as a necessary step to charge Byrd, the prisoner, with the crime of being accessory before the fact, to the murder of Cameron. This record was objected to upon the ground, that the county court, in respect to its power to try slaves for felonies, was a court of special as well as limited jurisdiction. That the record did not show that the court had jurisdiction of the subject matter; that it did not pursue strictly its authority; that its acts were irregular, and its judgment erroneous — and .that as such, it could be no evidence of the conviction of Daniel, but a mere nullity.
These objections I think wholly untenable as applied to this record. The county court, in reference to its authority or jurisdiction over felonies committed by slaves, was not a court of special jurisdiction. It was a permanent judicial tribunal; limited, it is true, in its jurisdiction over a particular class of persons; but general as to felonies committed by them. A special, as well as a limited jurisdiction is confined not to classes, but to individuals and special cases; such, for instance, as a court martial, “which has power to hear and determine in the particular inquiry, and upon the particular cases, with a view to which they are organ-ised.” 19 Johnson’s Reports, 32. But even jurisdictions of this character are sustained, and their' judgments incapable of collateral investigation, although erroneous, so long as they confine themselves within the line of their jurisdiction. 2 Sir W. Blackstone’s Reports, 1145. It may be regarded as well settled, that the judgment of any court, of however limited or special jurisdiction, when it appears that it had jurisdiction of the person and the subject matter; cannot be disputed collaterally. Nor will the judgment of any court of general jurisdiction be regarded as proof of any fact, unless it appears from the record that the court had actual jurisdiction of the person. 15 Johnson’s Reports, 181. The only difference between the judgment of a court of general jurisdiction, and one of special and limited jurisdiction, is this: *174 in the one case the jurisdiction of the court is presumed, until the contrary appear; in the other, a party claiming a right under it must know affirmatively that the court had jurisdiction. 1 Johnson’s Reports, 34.
In the case of the record before the court below, the jurisdiction of the court was established by law; and the record showed that it had jurisdiction as well over the person as the subject matter. Whatever errors there may be, (and I am inclined to think that there are none,) the judgment will not affect its validity, and cannot in this collateral manner be examined. As to the position assumed by counsel, that this record formed “ a part of the gist of the prosecution, and comes directly before the court,” I wholly dissent. It is only evidence; and of a necessary fact to convict the party charged before that court, of the crime of being accessory to the murder of Cameron. It was only introduced as evidence of the guilt of Daniel.
4. The fourth question is, did the court err in overruling the plaintiff’s challenge for cause to certain persons named in the bill of exceptions? The bill of exceptions shows that neither of the jurors were householders nor freeholders; and one of them, though a citizen of the United States, had resided in the state of Mississippi but eleven months. The statute law of this state, Revised Code, 136, provides that no person under the age of twenty-one nor above the age of sixty years; nor any person who is not a citizen of the United States, (except when a jury de mediatate lingum,) nor any person who has been convicted of felonies, perjury, forgery, or any other offence, &c., shall be capable to serve on a jury for the trial of any cause, civil or criminal, whatsoever.
Was it the intention of the legislature by this provision simply to designate and enumerate the causes which would incapacitate from serving as jurors? May it not with much greater reason be said that the legislature, by enumerating the persons disqualified, intended to establish that all others, not enumerated, should be deemed legal jurors? If the legislature, instead of pointing out the circumstances of disqualification, should have declared what were the necessary qualifications of a juror, would not all who could not show the required qualifications, be incapacitated by the mere force of an exclusion! This interpretation is to my mind mate *175 rially strengthened by the 133d section of the circuit law, which provides, that the petit jury, where the title to land is put in issue, must be freeholders. For is not this statute evidently based upon the supposition, that without this provision, those who were not freeholders would be competent jurors? This view is aided in no small degree, by the terms of the 1st section of the Bill of Rights. For who does not regard the right of serving on juries, as well as the right of being tried by jury, as an immunity of great importance; constituting a portion of the common birthright of the freemen of the state of Mississippi. The length of residence is not material as a qualification of a juror, for there is no practical rale now in existence in this state, by which it can be ascertained when he becomes a citizen of the state. The constitution does not define citizenship, and there is no law, if it were competent for the legislature to pass one on this subject, defining the qualifications of a citizen. And as the legal presumption is, that these jurors were residents of the county of Warren, the contrary not appearing from the record, I am disposed to regard them as legal jurors.
5. The fifth ground taken by the counsel having been abandoned, I have not noticed it.
6. But I will proceed to the sixth and last point which requires the attention of the court. The question arising upon a motion for a change of venue, was argued with much force and ingenuity by the counsel for the prisoner, and sanguinely relied on for a reversal of the judgment below. It, however, does not come before this court in a manner to authorise the adjudication of the court upon it. The affidavit, upon which the motion was based, and by which alone the correctness of the judgment of the court could be tested, is not part of the record. The prisoner, for the purpose of reversing the decision of the court, upon his motion for a change of venue, should have excepted to the opinion of the court, and, embodying the affidavit and the motion in the bill, made both a part of the record.
Having examined all the points which required investigation, I have come to the conclusion that the judgment must be affirmed.
Judge Wright dissented as to the objection to the-jurors.
*176 < January Term, 1835. — A reargument of this cause having been granted,'the opinion of the court was delivered at this term by
Mr. Chief Justice Sharkey.
This case was argued at the last term and is again before us by an order for reargument, granted in consequence of a division in the court, only two of the judges having heard the argument. The opinions delivered at the last term are adhered to, and the unpleasant task of deciding on the point of difference devolves on me. This circumstance of itself, independently of the importance of the question, is well calculated to produce in me a distrustfulness as to the correctness of the conclusion to which my mind has been drawn, and has, in a high degree, contributed to induce a scrupulous investigation of the principles which are to be regarded in the decision.
The most- of the points raised in argument were decided at the last term by the united opinion of the judges who were present. Several of them are of a high importance, and I have only to add my entire concurrence in the views then taken, so far as they are again raised in argument.
The qualifications requisite for a "juror, being the'only point of difference, remains to be considered, and it is not a little surprising that a question of such magnitude should have been permitted to remain so long without adjudication. In the examination of the question, under the particular structure of our government and laws, we must necessarily recur back to the- principles of the common law, as the great fountain from which we originally derived the trial by jury, and, indeed, from which the body of our municipal law is mainly drawn. The various statutory provisions in England, prescribing the qualifications of jurors, have existed so long and with such a variety of modifications by succeeding enactments, that, to rescue the common law principle from the obscurity thus created, is a task not entirely clear of difficulty. The learned commentators on the laws of England have not treated this subject with as much clearness as we could have wished, resting satisfied, doubtless, with the full enjoyment of the privilege as permanently secured; but I think they fully show that, according to the common law, in all courts of general jurisdiction, it was necessary that the jurors should possess a freehold qualification— *177 to what amount seems to have been a point unsettled, if any particular amount was necessary. Perhaps the better opinion is, that any thing which would constitute a freehold was sufficient; but I take it to be clearly shoym that a freehold was necessary. 3 Bacon’s Abridgment, 751-2; 4 Blackstone, 302; Littleton, s. 464. As the law stood at the time of the formation of the federal government, both the common and statute law of England required the possession of a freehold as necessary to qualify a juror, and the right of trial by jury, being of the highest importance to the citizen, and essential to liberty, was not left to the uncertain fate of legislation, but was secured by the constitution of this and all the other states as sacred and inviolable. The question naturally arises, how was it adopted by the constitution? that instrument is silent as to the number and qualifications of jurors; we must, therefore, call in to our aid the common law for the purpose of ascertaining what was' meant by. the term jury. It is a rule that when a statute or the constitution contains terms used in the common law, without defining particularly what is meant, then the rules of the common law must be applied in the explanation. The framers of the constitution must have meant; therefore,- to secure the right of trial by jury as it 'existed in England, either by the statute or common law, and the constitution, in the absence of all subsequent legislation, would have secured to the citizen this mode of trial and all its incidents not incompatible with the republican form of our government. The legislature cannot abolish or change substantially the panel or jury, but it may, it is presumed, prescribe the qualifications of the individuals' composing it. Our statute nowhere defines the number necessary to constitute a jury; but the number twelve, known as the number at common law, is no doubt what is meant by the constitution and all the statutes, when a jury is mentioned. If we have thus derived the number and consider it secured by the constitution, is it not also a fair inference that the incidents, such as the mode of selecting and the qualifications of the individual jurors, should also follow as necessary to the perfect enjoyment of the privilege? I think it does; and if the position be correct, any juror not possessing the qualifications required in that country from which our constitutional privilege was taken, and to the regulations and laws *178 of which the constitution must be supposed to have referred, could have been succesfuliy challenged, in the absence of a statutory regulation. It becomes necessary, therefore, to inquire how far the qualifications requisite for jurors have been fixed by statute? There are several statutes which must be noticed, the first of which is in the Revised Code, p. 133, beginning at the 122d section. This section provides that the assessor and collector of taxes of each county shall once in two years furnish to the clerk of the circuit court a list of the “ freeholders and householders who are citizens of the United States.” The names on the list ’ are to be put in a box, and the clerk is required to draw from it, in term time, one by one, “the names of thirty-six persons to serve as jurors at the next succeeding term.” ' A venire facias is to be issued for the persons drawn, and they are to be summoned by the sheriff; and a penalty is imposed if they fail to attend. The 125th section of the same act requires the clerk to keep another box, into which the names drawn shall be placed, and when they are all drawn out of the first box, he is to begin again. To ascertain the intention of the legislature in passing a law, is the primary object in construing it, and if that intention can be discovered, the statute should be so construed, as to carry it into effect. The first prominent feature of the statute before us, is the classes of citizens, whose names the tax collector is required to furnish. They are required to be freeholders and householders and to be returned with a view to a particular service. Citizen is a more general term than freeholder and householder, and we cannot suppose that the latter terms were used as more convenient. They convey distinct and definite meanings to the mind and are less comprehensive than several terms which would strike us as more appropriate, if intended to be used for the purpose of including all the inhabitants of a county. It is difficult to perceive why these words were used if not intended to fix a qualification, and direct from what class of citizens the jury should come. It will not do to suppose that the legislature intended by the words freeholder and householder, to comprehend all the male inhabitants of a county, for they must have been aware that in this and every other community, there is a large proportion of the population who are neither freeholders nor householders. We *179 cannot suppose either, that those terms were used uselessly: nor ■are we to conclude that they were used to designate a portion of citizens who would be likely to be known to the assessor, for it is equally his business to assess every individual, whether householder or not. The name of every male citizen above the age of twenty-one, and under fifty, is bound to appear on the tax list, as being subject to a capitation tax, whether they have property subject to taxation or not; and why should the assessor be required to make a selection from his list, of freeholders and householders, leaving out the other class, if it be not for the purpose, and with the sole object of pointing out what qualifications should be possessed by those required to be returned for the discharge of a duty. Is it also not obvious that the legislature considered the jury service as a duty to be performed, and that they intended to equalise the burden amongst those selected for the performance of it. This is manifest from the mode prescribed in drawing juries as contained in the 125th section of the act. Each individual liable to serve, is protected from an undue proportion of duty by the rotation resulting from the provisions of this statute; but this rotation, and the whole of the duty, is confined to a particular class of individuals.
If the legislature intended that all citizens should be qualified to serve on juries, I cannot perceive why the burthen is thrown upon freeholders and householders, whilst those not so situated, are privileged from the duty. Certainly, the favor is not the result of assessment, for he who has acquired by industry and economy, a freehold or household, to say the least, is as much entitled to the favorable consideration of the law-makers, as he that has not given these evidences of merit and industry. In the due course of summoning juries under the law, the consequence would be a total exemption to those least entitled to it; and I infer that such could not have been the intention of the legislature, but rather that they intended to disqualify them, by requiring the jury to be selected from such as possessed the evidences of a more permanent interest in the welfare of the community.
The act approved 16th December, 1830, contains the same provisions as the one above mentioned, in regard to the list of names to be returned by the assessor and collector, but there is an addi *180 tional provision in the first section which I think goes very far to show that the legislature intended to prefix a qualification as necessary to a competent juror. The language of the act is, that “ it shall be the duty of the assessor of taxes, within each county of this state, once in every year, to take and return to the circuit court" in term time, or to the clerk thereof at his office in vacation, a list of the names of all freeholders and householders, (being citizens of the United States,) within his county, liable to serve as jurors; and for the better ascertaining who are liable, the said assessor, whenever he shall have doubts as to such liability, is hereby authorised and required to take the statement of such person or persons under oath, (to be administered by him,) as to his or their liability to serve.” This act is directory only so far as regards persons liable to serve on juries, which necessarily presupposes that there are.some who are not liable. On which class does that liability fall? It must of course be that class whose names the assessor is required to return, and all of that class is liable to serve, unless especially exempted or especially excluded. For what purpose is he authorised to administer the oath, if he doubts as to the liability. He cannot be authorised to administer the oath, to ascertain who are exempt from liability, for that is a mere privilege which the individual may or may not claim. It is true there are many persons exempt from serving on a jury, such, for instance, as physicians, postmasters, preachers of the gospel, and, perhaps, many others; but they may exercise their privilege at discretion, and if they do not choose to be excused, it forms no ground for challenge. Nor can the assessor administer the oath to' ascertain who are expressly excluded, for this in most cases would be authorising him to inquire whether the individual have been disgraced; an inquiry which even the court could not make. I think, therefore, that the principal thing intended to be ascertained by administering the oath, is the freehold or household qualification; and if this be the case, it seems to me to follow that the legislature intended to make a freehold or household interest a requisite; and in order to obtain a performance of the duty they have provided, that the citizen shall not avoid it by a mere denial of his freehold or household interest.
It is argued for the state, that the 138th section, Revised Code, *181 136, by declaring that no person under twenty-one, or above sixty years, nor any person who is not a citizen of the United States, nor any person who has been convicted of felony, perjury, or forgery, or other offence punishable with stripes, &c., shall be capable to serve on a jury, is an evidence that all others are 'to be considered as qualified, and that by making the exception, the legislature intended that all others should be qualified. The disqualification of particular persons, and for particular causes, by no means shows that there is not a particular rule prescribing a qualification. The section referred to, creates only exceptions to the general qualifications as attaching to particular individuals, who, although they possess the general requisites, yet inconse-quence of some particular disability, are declared to be incompetent. It is evident that there must be a qualifying rule somewhere, either in the common or statute law, otherwise we should be led into gross perversions of the law. The language in this section is “no person” &c., and it would not do to say that every other person, except those expressly excluded, is qualified to serve.
It has also been said that serving on juries is a privilege, and cannot be taken away without express legislation. Considering it as a privilege to the juror merely, it might be questionable whether even express legislation could take it away from those in whom it had vested, but it is also certainly a privilege of no ordinary kind vested in the individuals interested in the trial, to have a jury of good and lawful men, and certainly this privilege is placed beyond the range of legislation.
The 133d section, Revised Code, 136, requires that the petit jury, when the title of land is in issue, shall be composed of freeholders. From this I do not think it can be inferred that jurors in other cases need not'be freeholders nor householders. The term freeholder in this section is no doubt used in contradistinction to householder, and is considered a higher qualification required by the nature of the controversy.
From the view that I have taken of the several statutes, it appears to me that the legislature intended that jurors should possess certain qualifications, and it is a subject of regret that the law is not more explicit in this particular. The right of trial by jury stands so conspicuous in the Bill of Rights, and its value is *182 so directly instrumental in the protection of the life, liberty, and prosperity of the citizen, that I could not but regard any legislation, tending to impair it, as injudicious. And it would be unfair to attribute to the legislature that has acted on this subject, any other than a desire to preserve it inviolate. It is then fair to conclude that the legislature, with a due regard for its value, intended to protect it from abuses on the one hand, by requiring the duty to be discharged by citizens exhibiting the most usual evidences of permanency and worth, and to relieve it on the other from a feature at variance with the spirit of our government. I do not think any particular length of residence is necessary to constitute a competent juror, as the counsel have insisted. The jurors are to be taken from the list returned by the assessor, taken, as we may presume, at the time of making the assessment. So soon as the assessment is made, therefore, the individual’s name may be returned, and he may be drawn to serve on a jury. It is, to be sure, necessary that he should be permanently located, and so soon as he is so, he becomes a citizen, entitled to all the privileges not expressly prohibited to him, and is Bound to perform all the duties from which he is not expressly exempt.
The jurors to whom the exception was taken in this case were on the special venire, and it is an invariable rule that jurors brought in by special venire, must possess the same qualifications necessary to make them competent to serve on the regular panel.
One of the jurors, on being asked after he was sworn on his voir dire, declared that he was neither a freeholder or householder, and the counsel for the prisoner challenged him for cause, which was overruled by the court, and a bill of exceptions taken, which brings the question fairly before this court as a defect appearing affirmatively on the record.
The judgment of the court below must be reversed.