## EPPES *vs.* MISSISSIPPI, GAINESVILLE, AND TUS-KALOOSA RAILROAD CO.

[ACTION BY RAILROAD COMPANY AGAINST DEFAULTING SUBSCRIBER.]

1. *Construction of contract of subscription to railroad company.*—Where the contract of subscription to a railroad company, after specifying that the shares were " to be paid to said company, or its proper officers, upon assessment and call, unless paid in work, &c., as hereinafter named," contained the following stipulations, to-wit : " *Provided,* however, that each subscriber may pay such per cent. of his subscription as he specifies below, by taking and performing a contract or contracts to that extent for the grading, earth-work, preparation and completion of the road bed ready for the iron, (bridging excepted,) by bidding off the same at public letting, and performing accordingly ; or, if he shall not bid off the same at public letting, then by taking such and so much at·private letting, of any portion not otherwise or before let, as shall be wanting to make up the amount, at the estimate of the engineer making the estimates ; the work to be executed, in either case, under the direction, and in conformity with the specifications of the chief or resident engineer, as is customary in railroad contracts ; and the company will arrange, so far as they can consistently with the provisions aforesaid, that subscribers may, where the road runs on or across their lands, be accommodated with working upon their own premises respectively,"—*held,* in an action by[the corporation against a defaulting subscriber, whose shares were specified to be taken " all in work"—

[1.] That the contract secured to the defendant the right of election to pay his subscription in work, either by bidding off a contract for work at public letting, or, in the event of his failure to bid off a contract at public letting, then by taking a contract at private letting, for any portion of the work not otherwise or before let, at the estimate of the company's engineer ; and that the company could not maintain an action against him, to recover the amount of his subscription in money, until an opportunity had been afforded him to make such election.

[2.] That this right of election on the part of the defendant did not extend to the entire route of the road.

[3.] That if the defendant failed, when an opportunity was afforded him by the company, to take a contract at public letting, it was his duty to notify the company of his election to take a contract at private letting ; and that, on his failure to give this notice within a reasonable time, his obligation to pay in money became absolute.

[4.] That notice of the assessments and calls, not being required by the charter of the corporation, was not indispensable to the right of action on subscriptions.

[5.] That the defendant, having contracted with the company while acting under the name given by its amended charter, and in that name, could not be heard to insist that there had been no valid acceptance of the amended charter.

[6.] That a letting of contracts by the company, in pursuance of a notice published in a newspaper, inviting proposals for bids, was a "public letting" within the meaning of the contract. (A. J. WALKER, C. J., *dissenting*, held that the contract required the lettings to be by public auction.)

[7.] That it was not incumbent on the corporation to give the defendant actual notice of the contemplated lettings, but only to give public notice as usual in such cases.

[8.] That a subsequent change in the location of the road, which had not been definitely located when the defendant subscribed, did not release him from his contract.

APPEAL from the Circuit Court of Sumter.

Tried before the Hon. WM. S. MUDD.

The amended complaint in this case was as follows:

"The Mississippi, Gainesville and Tuskaloosa Railroad Co.
*vs.*
Richard J. Eppes.

The plaintiff, a corporation created by the legislature of Alabama, claims of the defendant the sum of two thousand dollars, with interest thereon as hereinafter stated, due from the defendant to the plaintiff on an agreement in writing signed by the defendant, by which the defendant subscribed for and promised to pay for twenty shares, of one hundred dollars each, in the capital stock of said company, to be paid upon assessment and call of said company, unless paid in work by taking and performing a contract or contracts to that extent, for the grading, earth-work, preparation and completion of the road bed ready for the iron, (bridging excepted,) by bidding off the same at public letting, and performing accordingly; or, if he should not bid off the same at public letting, then by taking such and so much at private letting, of any portion not otherwise or before let, as should be wanting to make up the amount, at the estimate of the engineer making the estimates; the work to be executed, in either case, under the direction, and in conformity with the specifications of the chief or resident engineer, as is customary in railroad contracts. And the plaintiff avers, that after the defendant so subscribed and promised as aforesaid, he had opportunities, of which he was notified by the plaintiff, to pay said subscription in work, by taking and performing a contract or contracts

to that extent for the grading, earth-work, preparation and completion of the road bed of said road ready for the iron, (bridging excepted,) both by bidding at public letting and performing accordingly, and by taking such or as much of said grading, &c., at private letting as was not otherwise or before let, as was wanting to make up the amount, at the estimate of the engineer who made the estimates, but failed and refused to pay said subscription by so doing, or in any other way, although said contract was to be performed by him within a reasonable time after such opportunity occurred, and a reasonable time had elapsed. And the plaintiff further avers, that after the making of [said contract,] and after he had had opportunities as aforesaid to pay his said subscription in work as aforesaid, (the said subscription by the said defendant,) the said company duly made the following assessments and calls upon the subscription to the capital stock of said company, and upon the said subscription of the defendant, of the following amounts, and at the following dates, of all which the defendant had due notice, to-wit: Dec. 29, 1854, twenty per cent., to bear interest from the 1st July, 1855; Nov. 16, 1855, twenty-six and one-half per cent., to bear interest after thirty days; May 26, 1856, twenty per cent., to bear interest after thirty days; March 7, 1857, twenty per cent., to bear interest after thirty days. (Notice published in the *Independent.*) And the plaintiff further avers, that the said defendant has also failed to pay the said calls and assessments, or any part thereof, although notified thereof, and requested so to do; and that the same, with the interest thereon, are now due and unpaid."

To this complaint the defendant demurred, and specified the following causes of demurrer: "1. Because the said complaint is altogether repugnant and inconsistent, in that the said plaintiff avers and states therein a certain agreement in writing, alleged to have been signed by the defendant, and further avers and states therein that the undertakings in said agreement were to be performed by said defendant in a reasonable time, and that a reasonable

time had elapsed ; whereas the said defendant here insists
to the court, that time is not of the essence of said agree-
ment, and that said last averment is wholly inconsistent
with and repugnant to the terms and meaning of the said
agreement. 2. Because said complaint does not aver
that the whole of said grading, earth-work, and prepara-
tion of the road bed of said company ready for the iron,
had been contracted for or offered, at either public or
private letting. 3. Because the said averment, that said
taking and performing of a contract or contracts was to
be performed in a reasonable time, is a mere argumenta-
tive conclusion, and unauthorized by the alleged agree-
ment. 4. Because said complaint does not show any
sufficient cause of action. 5. Because it appears from the
face of the complaint that the action has been prema-
turely commenced. 6. As to the last assessment defend-
ant demurs, on the ground that there is no allegation that
notice was published in the *Independent.*" The court
overruled the demurrer, and the defendant then pleaded
"*nul tiel corporation,* and the general issue, in short by
consent, with leave to give any special matter of defense
in evidence."

On the trial, as appears from the bill of exceptions, the
plaintiff offered in evidence a contract in the following
words :

"The undersigned subscribers respectfully subscribe,
by their signatures hereto, for the number of shares in
the capital stock of the Mississippi, Gainesville and Tus-
kaloosa Railroad Company, set against their names here
respectively, at one hundred dollars the share ; to be paid
to said company, or its proper officers, upon assessment
and call, unless paid in work, &c., as hereinafter named.
*Provided,* however, that each subscriber may pay such
proportion or per cent. of his or her subscription as he or
she specifies below, by taking and performing a contract
or contracts to that extent, for the grading, earth-work,
preparation and completion of the road bed ready for the
iron, (bridging excepted,) by bidding off the same at pub-
lic letting, and performing accordingly; or, if he or she
shall not bid off the same at public letting, then by taking

such and so much at private letting, of any portion not otherwise or before let, as shall be wanting to make up the amount, at the estimate of the engineer making the estimates; the work to be executed, in either case, under the direction, and in conformity with the specifications of the chief or resident engineer, as is customary in railroad contracts; and the company will arrange, so far as they can consistently with the provisions aforesaid, that subscribers may, where the road runs on or across their lands, be accommodated with working upon their own premises respectively."

To this contract the defendant's name was subscribed, for twenty shares, "all in work." The defendant objected to the reading of the contract as evidence to the jury, "on the ground of a variance between it and the contract described in the complaint." The court overruled the objection, and defendant excepted.

The plaintiff read in evidence the act incorporating the "Gainesville and Mississippi Railroad Company," approved February 10th, 1852, and the two subsequent acts amending the charter of said corporation, approved respectively on the 14th January and the 14th February, 1854; the last act changing the name of the corporation to that of the "Mississippi, Gainesville and Tuskaloosa Railroad Company."—See these several acts in the Session Acts of 1851–2, p. 207; and Session Acts 1853–4, pp. 267–8. The plaintiff also read in evidence from the record book of the corporation, in which were recorded all the proceedings had at the several meetings of the stockholders and board of directors, the entries showing the organization of the company under its charter on the 12th November, 1853, and all the entries relating to the acceptance of the amended charters. The view taken by the court of the question of acceptance renders it unnecessary to set out these entries, which the defendant contended were not sufficient to show a valid acceptance of the amendments. The plaintiff also proved, that the several assessments and calls on stockholders were made at the time specified in the complaint, and were published

in the Independent, a newspaper printed and published in the town of Gainesville.

The record book of the corporation showed that, at a meeting of the board of directors held on the 28th August, 1854, it was resolved, " that the president of the board be, and he is hereby, authorized to advertise for and receive proposals for the grading and construction of said road, or such portion of it as he may deem advisable, and to close contracts for the same, so soon and so far as, in his judgment, subscriptions will justify." On the 3d November, 1854, at a meeting of the same board, it was ordered, " that the president proceed to .advertise for proposals to do the clearing, grubbing, earth-work, masonry and other local work on the road, from Gainesville to the Mobile and Ohio road, to build a bridge across the Tombeckbe river, and to do the trestle-work on both sides of the river to the high land; and, so soon as subscriptions shall justify, let out the work to the Tuskaloosa line;" and at the same meeting it was voted, " that proposals for the work be received to the 9th December next." "The foregoing was all the authority given for advertising and letting in pursuance thereof the work in Sumter county, and to the Mobile and Ohio Railroad in Mississippi. . It was shown that this portion of the road was 22 miles long, and that from Gainesville to Tuskaloosa about 45 miles; that the defendant lived in Sumter county, near the location of the road; and that his subscription was made on the 24th June, 1854. In pursuance of the aforesaid action of the board, an advertisement, dated the 3d November, 1854, was published in the Gainesville Independent, a newspaper printed and published in the town of Gainesville, weekly, for six consecutive weeks, (it being the only public notice for the letting out of contracts on that portion of the line therein specified,) in the following words, to-wit:

### "NOTICE TO RAILROAD CONTRACTORS.

"By order of the board of directors, I invite proposals for the following work on the Mississippi, Gainesville, and Tuskaloosa Railroad: 1. For the grubbing, earth-

work, and grading of the road from Gainesville to the line of the Mobile and Ohio road. 2. For culverts and one truss-bridge on same. 3. For cross-ties and timbers. (These, so far as available, we are authorized to take from Government lands.) 4. For bridge across the Tombeckbe river. 5. For trestle-work on each side of the river. 6. For embankments on each side of the river, to carry to high ground. The directors also voted instructing me to let the balance of grading in Greene county so soon as the local subscription authorized. Those submitting proposals will specify whether they will take any, and, if any, what portion of their pay in stock of the company. Proposals will be received until the 9th December next."

(Signed,)         JONA. BLISS,

Pres. M., G. & T. R. R. Co.

At another meeting of the same board of directors, held on the 8th *November*, 1856, the following resolution was adopted : "*Resolved*, that the company, acting under the provisions of the original charter and the several amendments granted, (which are accepted in full,) will proceed to extend their road from Gainesville to the city of Tuskaloosa, and will receive proposals therefor; and the president, consulting with the engineer, be, and he is hereby, authorized to receive the proposals, and close the contracts therefor when the proposals are satisfactory, or report the same to the board for its action when he deems it advisable." "Accordingly, under this action of the board, (which was the only authority therefor,) an advertisement was published in said *Gainesville Independent*, weekly, for several weeks, (it being the only public advertisement that was made for the letting of the work over the line therein mentioned,) in the following words," to-wit:

"NOTICE TO CONTRACTORS.

OFFICE OF M., G. & T. R. R. Co., }
Gainesville, *Oct.* 8th, 1856. }

" The Mississippi, Gainesville, and Tuskaloosa Railroad Company invite proposals for contracts, for the grubbing, clearing, earth-work, grading and masonry necessary for

the superstructure of the road way of the second and third divisions of their road, commencing on the east bank of the Tombeckbe river, opposite Gainesville, and extending through Greene and Tuskaloosa counties, to the city of Tuskaloosa. Proposals, sealed, endorsed, and directed to the president, will be received at this office until the 10th November; at Clinton, in Greene county, on the 11th and 12th days of November; and at Foster's store on the 14th and 15th days of November next. Parties making proposals, are desired to make them in the following form: one-half payable quarterly, in cash, and one-half in the stock of the company. Maps, profiles and specifications may be seen at this office until a few days before the lettings, when they will be exhibited at Clinton and Foster's store; and any further information will be furnished on application to the engineer. The work through Greene county will be let to contractors, at Clinton, on Tuesday and Wednesday, the 11th and 12th days of November; and the work through Tuskaloosa county will be let to contractors, at Foster's store, on Friday and Saturday, the 14th and 15th days of November; the entire work to be completed in two years. The line traverses a densely populated country, well watered, and provisions cheap; and the character (?) is through a light, sandy soil, and offers great inducements to contractors, especially planters living along the line of the road."

(Signed,) . ' ROBERT CRAIG,

President *pro tem.*

" The proof showed that there was no letting out of contracts at any time, at public outcry, for any part of the road. There was proof tending to show that the defendant had never offered to bid for any contract or contracts of work of any kind. There was no proof that he had ever been personally notified of a letting, or that he was notified he could bid privately at private letting, or that he was a subscriber to the newspaper in which said advertisements were published; but it was proved that he lived near the line of the road, about nine miles from Gainesville. It was proved, also, that at the time the

defendant subscribed, there was a line of survey run and marked out, which, according to one witness, touched the defendant's lands whereon he lived, and according to another, ran about a quarter of a mile off; that the line on which the road was finally located had not then been run; and that the road was afterwards, before the assessments, located about a mile and a half from the defendant's said lands. It was shown that the said company, under its amended corporate name, was still acting as such, and that there was a meeting of its board of directors as late as the 12th June, 1858. The record books of the company, above referred to, showed that the board of directors, at a meeting held on the 28th December, 1854, proceeded to let contracts upon bids received, whereupon eighteen out of twenty-one sections (being the whole number from Gainesville to the Junction) were let; but no contract for cross-ties was let, and the other sections were subsequently let for grading and earth-work."

" On the 27th March, 1857, at a meeting of the stockholders of said company, the following resolutions were adopted, to-wit: ' *Resolved,* that it is the determination of the company to complete the road from the Junction to Gainesville. *Resolved further*, that, for the present, no further steps be taken to continue the work from Gainesville towards Tuskaloosa, until the subscribers for stock on the north side of the river shall express their wish that it shall be done; and that until that wish be expressed, through the medium of a meeting or meetings of themselves, no assessments on their subscriptions shall be made, further than shall be necessary to defray a just proportion of the expenses incurred on that side of the river. *Resolved,* that the subscribers for stock on the north side of the river be requested to hold a meeting at Clinton, on the 4th Saturday in April, for the purpose of determining for themselves whether the work on the road from Gainesville towards Tuskaloosa shall be continued, and to send a record of the proceedings of said meeting to the president of this company.' There was no proof of any meeting of the subscribers on the north side of the river, as contemplated in the foregoing resolutions, nor of

4

any action by them in any respect on the matter; but the proof tended to show, that the enterprise north of the river was abandoned, and that very little work on that side had been let or done, although about nine-tenths of the grading of the road was done from Gainesville to the Junction on the Mobile and Ohio road.

" The court charged the jury, 'that if they believed the evidence, they must find the issue on the plea of *nul tiel corporation* for the plaintiff;' also, 'that if they believed from the evidence that notice was published in the *Gainesville Independent*, for several weeks, inviting proposals for work, and that proposals were received and contracts let out pursuant to said notice, they were authorized to find that there had been a public letting, within the terms of the defendant's contract of subscription.' "

The defendant excepted to each of these charges, and then requested, in writing, the following charges:

" 1. That the jury, if they believe from the evidence that the acts of the legislature, amending the charter of the Mississippi and Gainesville Railroad Company, were not accepted at a legal meeting of the stockholders of said company, must find for the defendant.

" 2. That the jury, if they believe from the evidence that the said acts of the legislature were not accepted at a legal meeting of the stockholders of said company, convened upon due and legal notice, must find for the defendant.

" 3. That the jury, if they believe from the evidence that the said acts of the legislature were not accepted at a legal meeting of the stockholders of said company, convened upon due and legal notice, specifying the nature of the business to be transacted, must find for the defendant.

" 4. That the jury, if they believe from the evidence that the said acts of the legislature were not accepted by said company at a meeting of its stockholders, convened upon due and legal notice, personally served on each corporator, giving notice of the business intended to be transacted at said meeting, must find for the defendant.

" 5. That the jury, in considering the question of a

reasonable opportunity given to the defendant to enter into contracts for work, may take into consideration the whole extent of the road, and the extent of that portion offered to be let out.

" 6. That the agreement sued on gave subscribers the privilege of working on their lands, when the same could be done consistently with the terms of the contract; and that if the location of the road, at the time the defendant subscribed, ran through his land, a change of location, without his consent, was a violation of the contract, and released the defendant.

" 7. That the defendant was entitled to have a choice in saying what kind of work he would perform, and where to be performed; and that if the jury believe that three of the assessments were made before allowing any opportunity for taking contracts, on by far the greater portion of the line of the road, then such assessments are void as to the defendant.

" 8. That the burden of proof is on the plaintiff, to show actual notice to the defendant of the offer to let out contracts.

" 9. That a public letting, such as is mentioned in the contract, is not performed by a public notice for bids.

" 10. That if the defendant subscribed to a road to run beyond Gainesville, and the company afterwards directed that the same should not be carried beyond Gainesville, the defendant was thereby released, unless he assented thereto."

The court refused each of these charges, and the defend ant excepted to the refusal of each; and he now assigns as error the overruling of his demurrer to the complaint, the admission of the contract in evidence, the charges given by the court, and the refusal of the several charges asked.

A. S. Van deGraaff, and T. B. Wetmore, for the appellant.—1. The demurrer to the amended complaint should have been sustained for the reasons specified, as hereinafter shown.

2. There was a fatal variance between the contract

described in the complaint and that offered in evidence. Under the averments of the complaint, subscribers to the railroad company became unconditional money subscribers, notwithstanding their subscriptions were payable in work; and a failure on their part to take and perform a contract at the first letting of contracts, or within a reasonable time thereafter, would render them liable, on assessment and call, as if their subscription had been unlimited by the words "payable in work." Under the contract offered in evidence, each subscriber is liable on assessment and call, "unless paid in work, &c., as hereinafter named;" and the subsequent stipulations entitle him to discharge his subscription by taking and performing a contract for grading, or for earth-work, or for the preparation and completion of the road bed for the iron, (bridging only excepted;) each being different in kind, more or less profitable, and to be performed at successive periods of time. A contract for one species of work might suit a subscriber, and induce his subscription, when either of the others would be utterly out of his power. A fair construction of this contract, it is submitted, gives the defendant, whose subscription was payable "all in work," the privilege of choosing what kind of work he would perform, and, if he should not bid off a contract at public letting, the further choice of location on any part of the road not otherwise or before let. The stipulations of the contract were purposely made favorable to subscribers, in order to induce subscriptions, and the contract must, therefore, be construed most strongly against the company.—2 Parsons on Contracts, 18. The provisions of the contract amount to an implied guaranty on the part of the company that the road should be built, and that there should not be a useless expenditure of labor and money.

3. There was no valid acceptance by the company of the acts amending its charter.—Angell & Ames on Corporations, 553; Grant on Corporations, 164–6; 2 Cranch, 166; 27 Miss. 517; 29 Ala. 573; 2 Kent's Com. 298; 1 N. H. 44; 4 Ala. 70; 5 Ala. 787; 16 Ala. 374; 15 Pick. 363; 4 Metc. 176; 13 Mass. 271; 7 Conn. 219; 2 Russ. & My. 461; 10 Beavan, 61; 3 Eng. L. &. Eq. 144.

4. Aside from the propositions above contended for, the defendant is clearly not liable to the railroad company for anything, until he has had an opportunity of taking a contract for work "by bidding off the same at public letting." A public letting, it is submitted, can only be effected by public outcry: it presupposes bidders for the same work, with equal opportunities to all, the lowest bidder to have the contract publicly offered. The substitute for this which the court deemed sufficient, was a public advertisement for proposals. In the case of public letting, so soon as the bidding commences by outcry, bidders and the company are each in a condition to be bound by a definite contract so soon as the crier knocks it off; but, under the plan adopted by the court, the subscribers might be forever prevented from obtaining a contract, at the option of the company. The difference between the two plans is wide and important: one secures to the defendant a valuable right, while the other confers on the company the power to destroy that right, and to render the stipulation of the contract, which was obviously intended for the defendant's benefit, utterly nugatory.

5. The 5th and 7th charges asked should have been given. The contract secured to the defendant the right to select a contract for work along the entire route of the road, while but a limited portion of the road was in fact let out; and he was not to be restricted, in making his selection, to any particular kind of work. The first three assessments were all made before any opportunity was afforded to negotiate for contracts on by far the greater portion of the road, as is shown by the dates of the several assessments and of the action of the board of directors.

6. The defendant was entitled to notice, and the *onus* of proving it was on the plaintiff.—2 Parsons on Contracts, 180–82; 30 Ala. 666; 4 Ala. 70. The court erred, therefore, in refusing the 8th charge asked.

7. On the 27th March, 1857, the company decided, in effect, not to continue the road beyond Gainesville towards Tuskaloosa; and subscribers on that side were released from the greater portion of their liability. It was left to them, and not to the subscribers generally, to decide

whether the road should progress in that direction, or should stop at Gainesville. But the defendant subscribed to the road under its new name and charter; and the company, by discriminating between the subscribers—allowing a portion of them to release themselves, and confining the others to the limits of the original charter—committed a fraud on him. He was thereby not only prevented from performing work on the road in Greene and Tuskaloosa counties, if he had chosen to do so, but became liable to do work for an enterprise entirely different from the one which he had agreed to promote. The 10th charge asked, therefore, ought to have been given.

8. The 6th charge asked ought to have been given. By the terms of the contract, the company was to arrange with subscribers, as far as it conveniently could, that they should be accommodated with work on their own premises, when the road ran on or across their lands. At the time the defendant subscribed, the road touched, or at least ran within one-fourth of a mile of his lands; and he must be supposed to have subscribed with reference to that location. The subsequent change in the location of the road released him from liability on his subscription.

REAVIS, *contra.*—1. The contract stated in the complaint is to pay upon assessment and call, unless paid in work, &c. The stipulation that the subscription may be paid in work, is for the benefit of the defendant; and it was his duty to pay, or offer to pay in work, in order to avoid his liability to pay in money. Having omitted to do so, he became liable to pay in money, upon assessment and call; and it was not necessary to state any part of the contract, except that which shows his liability to pay on assessment and call. Consequently, all else that is stated in the complaint is surplusage.—Plowman v Riddle, 7 Ala. 775; McRae v. Raser, 9 Port. 122; Love v. Simmons, 10 Ala. 113. All of the complaint to which the demurrer applies being surplusage, the defendant was not injured by the overruling of his demurrer; and therefore, the overruling of it is not error. If these views be correct, they entirely dispose of all the grounds of demurrer.

2. Suppose, however, these positions are wrong; still, the demurrer was properly overruled. The 1st and 3d grounds assigned present the same point, viz., that the statement that the defendant was to perform the work in a reasonable time after he had an opportunity afforded him by the plaintiff to do so, is not authorized by the contract, and is an unauthorized conclusion of law. The following authorities are a sufficient answer to these grounds: 2 Parsons on Contr. 173, and note (e); cases cited in Shepherd's Dig. pp. 497–8, §§ 135, 140. The 2d, 4th, and 5th grounds of demurrer, and the 5th and 7th charges asked, present the question, what is the true construction of the contract, and may be considered together. If the construction contended for above is not the true one, what is the true construction? The rule, in construing contracts of this description, is, that the construction should be such as to facilitate the object of the enterprise.—McMillan v. Mays. & Lex. Railroad Co., 15 B. Mon. 218; Pierce on Am. Railroad Law, 75; 17 Barb. (N. Y.) 579; 5 Ind. 247. The object of the enterprise was, to construct a railroad between the points and places mentioned in the charter and amendments, as speedily as possible. The construction of the contract contended for by the appellant, tends to delay and defeat this object; for, if that construction be correct, he cannot be called upon to pay his subscription in money, *until the last foot of grading, and the last cross-tie necessary to be laid down, from one end of the road to the other, have been put under contract.* This seems to be a very unreasonable construction of the contract, and certainly never was intended by the parties. The provision in the contract, that those who wished to pay their subscriptions in work should be accommodated, as far as could be done consistently with the contract, with work to be done on their own lands, shows that it was intended that the work should be done as it might be required on those lands. The true construction of the contract, therefore, is this: The defendant was to pay the amount of his subscription in money, on assessment and call, unless he should take a contract for work, as soon as the company afforded him a reasonable opportunity to

do so. If the company afforded him reasonable opportunities to take a contract, both at public and private letting, and he failed to avail himself of them, he became bound absolutely to pay in money, upon assessments and calls made afterwards. Moreover, the privilege allowed by the contract to the defendant, of paying his subscription in work, being for his benefit, is one that he could waive; and the facts alleged in the complaint, and stated in the bill of exceptions, show that he had waived it. If he had, he thereby became bound to pay the assessments and calls made after such waiver.

3. The omission to aver in the complaint that notice of the last assessment mentioned in it was published, is no ground of demurrer. That omission only occasions the loss of *interest* on that assessment. The *amount* of the assessment itself the defendant would be bound to pay, if notice should never be published.

4. If either of the constructions of the contract above contended for be correct, there was no variance between the complaint and the contract read in evidence. It is always sufficient to declare upon a contract according to its legal effect.—See the authorities cited in 1st paragraph.

5. The charge of the court, on the plea of *nul tiel* corporation, was authorized by the evidence set out in the bill of exceptions. *The defendant's contract was with the plaintiff by its corporate name under the amendments of the charter.* This was an admission of the existence of the corporation, which estopped the defendant from denying that fact.—Montgomery Railroad Co. v. Hurst, 9 Ala. 513; Duchess Cotton Man. Co. v. Davis, 14 Johns. 239; Hamtranck v. Bank of Edwardsville, 2 Mis.; Tar River Nav. Co. v. Neal, 3 Hawks, 520; Searsburgh Turnpike Co. v. Cutler, 6 Vermont, 315; Selma & Tennessee Railroad Co. v. Tipton, 5 Ala. 808; Jones v. Dana, 24 Barb. (N. Y.) 395; Bank of Circleville v. Renick, 15 Ohio, 337; Duke v. Cahaba Nav. Co., 10 Ala. 82; Ang. & Ames on Corp. § 635.

If the contract by the defendant with the plaintiff does not *estop* him from denying the corporate character of the plaintiff, it is at least *prima-facie* evidence of the plaintiff's

corporate existence. This, together with proof of organization under the original charter, user under it, and continued user under the amendments of the charter, all of which is shown by the bill of exceptions, in the absence of any proof that the amendments were rejected or objected to by any of the original corporators, is sufficient evidence of acceptance of the amendments, to authorize the charge of the court. There is no reason why the same presumption of acceptance of an amended charter, under such circumstances, should not be indulged, that is indulged in respect to the acceptance of an original charter. It is not necessary that the records of the corporation should show a formal or written acceptance of the amendments, nor that notice of a meeting for the purpose of accepting them was given. The acceptance of the amendments may be presumed merely from the exercise of corporate powers under them.—Taylor v. Comm'rs of Newberne, 2 Jones' (N. C.) Eq. 146; Russell v. McLellan, 14 Pick. 63; Ang. & Ames on Corp. §§ 238, 284, 94, 83, and note 1 on p. 79; Wetumpka & Coosa Railroad Co. v. Bingham, 5 Ala. 657; Bank v. Dandridge, 12 Wheat. 71; 1 Hall, 191; also, the authorities cited above. The bill of exceptions shows that the amendments were formally accepted by the directors of the company; that the *stockholders* (which expression includes *all*) were apprised of the fact, at an annual meeting shortly after the date of the defendant's subscription; that the *company* is still acting under the name given by one of them; that contracts had been let out, and nearly twenty miles of the road graded, under the amendments; and that rights had been acquired, and liabilities incurred under them. Under these circumstances, every presumption will be made in favor of the legal existence of the corporation.—Duke v. Cahaba Nav. Co., 10 Ala. 91; Road Co. v. Creeger, 5 Har. & Johns. 122; Farmers' Bank v. Jenks, 7 Met. 594.

6. The 2d charge given, and the 9th charge refused, present the question, what is a public letting within the meaning of the contract. The contract, in this respect, ought to be considered in reference to the general usage of such corporations in such cases. It is a part of the

history of the country, and of railroads, of which the court will take judicial notice, that contracts for work on the road are let through the medium of proposals, and not by public auction. Such contracts could only be let at public auction, to the *lowest* bidder, without regard to the fitness or ability of the bidder to perform the contract, —which considerations it cannot be supposed the company intended to deprive themselves of. That this mode was not intended by the contract in question, is shown by the provisions in the contract, that the company would arrange, as far as could be consistently with the other provisions of the contract, that subscribers who should agree to pay in work should be accommodated with work on their own premises. This could not be done, if the company, before it could hold the defendant liable, was bound to let out the contracts for work at public auction.

7. The 1st, 2d, 3d, and 4th charges refused, present the same questions which are discussed in paragraph 5. Moreover, the charges were properly refused, because each one of them refers a question of law to the jury. What constituted a "legal meeting," &c., is a question of law. See cases cited in Reavis' Dig. p. 318, § 51; and in Shepherd's Dig. p. 463, § 76.

8. The 6th charge asked for, was properly refused also. There was no proof that the line run "*through*" the land of Eppes; nor was there any proof that the road was "*located*" to run through his land; nor was there any proof of a *change of* "*location*." The charge was, therefore, abstract. But, if it were not, the facts assumed in it do not release the defendant from his subscription. For, even if the contract be construed to contain mutual stipulations, the stipulations are *independent.*—17 Barb. 579; 5 Ind. 247.

9. The 8th charge asked for, was properly refused also. By becoming a subscriber for stock, the defendant became a member of the corporation. He is, therefore, *presumed* to know that the company had made proposals inviting contracts for work. Proof of "*actual notice*" to him, therefore, was not necessary. Moreover, the stipulation that he might pay his subscription in work being for his ben-

efit, *he was bound to take notice of offers to let out contracts,* and to apply for one, either at public or private letting.

10. The 10th charge asked for, was properly refused also. The facts stated in the charge constitute no defense. Smith v. Plank-Road Co., 30 Ala. 650. Even if the company had released the subscribers to the road north of Gainesville, that would have furnished no ground of defense for Eppes.—Hall v. Selma & Tenn. Railroad Co., 6 Ala. 741. Besides, the charge assumes that the company had "*directed*" that the road *should not* be carried beyond Gainesville, when there was no proof to that effect.

A. J. WALKER, C. J.—The defendant's contract must be construed as importing a promise to pay two thousand dollars, upon assessment and call, to the capital stock of the plaintiff, with the privilege of discharging it by taking and executing a contract for the making of the road bed, and preparation of it for the iron, (bridging excepted,) which contract might be taken at public letting, or, if not bid off at public letting, might be taken at private letting, to such extent as might be necessary to make up the amount, at the engineer's estimate. The contract also contains a stipulation on the part of the plaintiff, to accommodate subscribers, on whose lands the road might be located; with work upon their premises, as far as it could consistently with the provisions of the contract. If the plaintiff had preferred a payment in work done upon the road bed, it could not have coerced payment in that manner. The right of election, as to the mode of payment, pertained to the defendant, not to the plaintiff. The defendant secured to himself, by the terms of his contract, the privilege of electing whether he would pay in money, or by the taking and execution of a contract for the construction of the road. In the event of the defendant's election to pay in work, he was by the contract entitled to the further privilege of taking a contract by bidding off the same at public letting ; and failing to bid off a contract at public letting, which would discharge the debt, he had the privilege of paying by taking a contract

at private letting, to do work not otherwise or before let. The privilege of election, as above set forth, was a right of the defendant secured by the contract.

It was impossible to make an election to pay in work, until an opportunity was afforded to him of bidding off a contract at public letting; and if he failed to take a contract at public letting, the performance of which would discharge the debt, until an opportunity was afforded of taking a contract at private letting, to do work not otherwise or before let. The collection of the debt for stock out of the defendant, without affording such opportunity, would practically abrogate the provision of the contract which secures to the defendant the right at his election to pay by taking and executing a contract.

The contract in this case differs from those construed in Lane v. Kirkman, Minor, 411; McRae v. Raser, 9 Porter, 122; Plowman v. Riddle, 7 Ala. 775; and Love v. Simmons, 10 Ala. 113. See, also, 2 Parsons on Con. 163. Under all those contracts, the power of making the election depended upon no act of the promisee, but alone upon the promisor's volition. Here the election to pay in work could not be made, until the plaintiff so acted as to enable the defendant to make it in the manner provided by the contract. In those cases it was correctly decided, that the promisor should notify the other party of his election. In this case, the defendant might signify his desire to pay in work, before he had an opportunity of taking a contract; but he could not make a binding election, until the opportunity was had. A party is never required to make an election, until full information of every thing calculated to influence the choice was possess-ed.—Reaves and Wife v. Garrett, at the present term. Such information could not be had, until the letting of contracts occurred. Besides, the defendant's stipulation is to pay in money, or in work; and there can be no failure to comply with that stipulation on his part, until he has an opportunity to pay in work; for it would be absurd to say that the defendant had broken his obligation to pay in work, when the plaintiff had not made it possible for him to do so.

[2.] While it was incumbent upon the plaintiff to give the opportunity above specified, the defendant cannot, under the contract, claim that he should not pay in money, until he had had an opportunity of selecting a contract from the route of the road in its entire extent. The plaintiff's duty would be discharged, by offering lettings of work in the manner contemplated by the contract, to such an extent as would enable the defendant to exercise the privileges provided for him. He has not stipulated for the privilege of selecting the place of his contract from the entire route of the road, and cannot complain that an opportunity of making such election has not been afforded.

[3.] If the plaintiff afforded to the defendant an opportunity to take a contract, by bidding off the same at public letting, then the defendant's privilege of taking a contract at private letting extended only to "any portion not otherwise or before let." Whether he would avail himself of that privilege, was a matter for his own determination; and the plaintiff could be required to do nothing more in reference to it, than to allow a reasonable time to the defendant to make known his determination. If he elected to take a contract at private letting, it was his duty to give notice of his election. As there was no time specified, within which the election was to be made, the law prescribes that it should be made within a reasonable time; and in the event of a failure to make it within a reasonable time, the obligation to pay in money would become absolute.—See the authorities above cited; also, Skinner v. Bedell, 32 Ala. 44; Shepherd's Dig. 497, § 135.

[4.] Unless notice of the assessments and calls is required by the charter of a corporation, it is not indispensable to the right of action upon subscriptions to the capital stock, that such notice should be given.—Pierce on American Railroad Law, 77; Br. Bk. v. Gaffney, 9 Ala. 153; Henderson v. Howard, 2 Ala. 342; Evans v. Gordon, 8 Porter, 142; Montgomery v. Elliott, 6 Ala. 701.

The propositions which we have thus far maintained, lead us to an approval of the rulings of the court below upon the defendant's demurrer, and upon the objection to

the admission in evidence of the written contract, and upon the 5th and 7th charges requested by the defendant.

[5.] The plaintiff acted as a corporation under its amended charter, and the defendant contracted with it when so acting, and contracted with it in the name which it was authorized by the amended charter to take. That there was a legal acceptance of the amended charter, the defendant, who contracted with the plaintiff when acting under the amendment, and in the name authorized by it, cannot deny.—Tar River Nav. Co. v. Neal, 3 Hawks, 520, opinion of Henderson, J., 537 ; Jones v. Dana, 24 Barb. 399; Dutchess Cot. Man. Co. v. Davis, 14 Johns. 245; All Saints Church v. Lovett, 1 Hall, (N. Y.) 198; John v. F. & M. Bk. of Ind., 2 Blackf. 367 ; Searsburg Turnpike Co. v. Cutler, 6 Verm. 315; Congregational Society v. Perry, 6 N. H. 164; Hamtranck v. P., D. & C. of Edwardsville, 2 Mis. 169 ; 2 Ld. Ray. 1535 ; Mont. R. R. Co. v. Hurst, 9 Ala. 513 , Duke v. Cahaba Nav. Co., 10 Ala. 90; Selma & Tenn. River R. R. Co. v. Tipton, 5 Ala. 808.

It is a result of this last proposition, that there was no error in the 1st charge given, nor in the 1st, 2d, 3d, and 4th refusals to charge as requested by the defendant.

[6.] The second charge given asserts, that the letting out of contracts in pursuance to a notice in a newspaper calling for proposals was a public letting within the meaning of the defendant's contract; and the 9th charge requested seems to have been designed to assert the converse of that proposition. By the terms of his written agreement, the defendant had a right to take a contract by *"bidding off the same at public letting."* By giving the second charge, and refusing the defendant's ninth request to charge, the court made a *public* letting consist of a letting in pursuance to a notice in a *public* newspaper inviting propsals for contracts, and treated an opportunity to *make proposals* for a contract in pursuance to such notice as an opportunity to *bid off* a contract. Upon the doctrine of the charge, if the corporation advertised for proposals, and, when they were made, acted upon them in private, and in private assented to or rejected them, there was a bidding off contracts at a public letting, and there was afforded to

the defendant an opportunity to bid off a contract at a public letting.

By turning to Webster's dictionary, I find that "*letting*" is an americanism, used to signify the act of *putting out* portions of work to be performed by contract, as on a railroad or canal, and it has in our country that acceptation. The letting or putting out of the contract is a different thing from the invitation to make proposals for it. The letting is posterior to the invitation for proposals. It is made after the proposals have been received in pursuance to the invitation, and after they have been considered; and is the act of awarding the contract to the proposer. The distinction between the advertisement for proposals and the letting of a contract is precisely the distinction between the advertisement of a sale and a sale. There may be an advertisement for proposals, and no letting; as there may be an advertisement of a sale, and yet no sale. There may be *public* advertisement, calling for proposals, and yet the letting may be private; just as there may be a public notice of a sale, and yet the sale may be private. If the defendant's stipulation had been for an opportunity in the first place to take at a *private* letting, it would scarcely be contended, that the defendant had had no opportunity to take at a *private* letting, because the plaintiff had invited proposals by a *public* advertisement. If the defendant had, in such case, argued his immunity from liability to pay in money, he would have been told, that the *public* call for proposals did not impair his opportunity *privately* to apply for and take a contract; and that, notwithstanding the public call, he might have applied for and taken a contract under circumstances of the profoundest secrecy. If a letting after public call for proposals would be deemed private to satisfy the requisitions of such a contract, it cannot be *public* in this case, in order to satisfy the requisition of a contract containing a precisely opposite stipulation. A letting of the same character cannot be private or public at the option of the plaintiff.

The contract itself plainly discriminates between a public and a private letting, in providing for the de-

fendant a right to take contracts in succession at lettings of the two different characters. No reasonable or useful purpose can be found for the discrimination between public and private lettings, and for carefully securing to the defendant the privilege to take first at one, and then, if necessary, at the other, if we consider a letting as public or private, without regard to the circumstances of publicity or privacy under which it is made, according as it was made with or without public notice calling for proposals. Under such a view of what is meant by a public letting, the defendant does not provide for himself any substantial benefit which he would not have had if he had merely provided for himself a right to take at private letting. If public letting had been entirely omitted from the contract, he would still have had the privilege, in common with the rest of the community, of proposing terms for a contract to the private consideration of the plaintiff.

.The defendant here has stipulated for the privilege, not only of taking a contract at a public letting, but of taking it by "*bidding*" at a public letting; and not only that, but by "*bidding*" it "*off*" at a public letting. The language is, "by *bidding off* the same at public letting." *Bidding*, in its comprehensive sense, is making an offer; but, in its more ordinary acceptation, it signifies the making of an offer at an auction.—Bouvier's Law Dict., *Bid, Bidder ;* Payne v. Cave, 3 Term R. 149; 2 Kent's Com. 734. One is said to bid *off* a thing, when he bids at an auction, and the thing is knocked down to him in immediate succession to the bid, and as a consequence of it. The expression "*bidding off*" a contract at public letting, would manifestly be perverted, in using it for the description of a transaction, in which proposals were made and privately passed upon, as the judgment of the plaintiff, uncontrolled by the consideration of the lowest bid, might dictate. If a private gentleman should advertise for proposals to do a work, and, after receiving the proposals, should, in the exercise of his discretion, award the contract to one of the proposers, no one would say that the contract had been "bid off" at a public letting.

I do not controvert the position, that the parties must be regarded as having contracted with a view to facilitate the enterprise of constructing the railroad. There are, doubtless, cases in which the court, construing a contract in the light of this presumed intention of the parties, might attain a conclusion more favorable to the corporation than would otherwise be adopted. But the court, in the application of the principle, must not permit itself to be led into the consideration of doubtful questions of policy involved in the construction of railroads. To do so, would constitute us judges of what is expedient in railroad building, as well as of law. The policy, to which we could look in the construction of a contract, must be palpable, and not disputable. It is not sufficiently manifest, that the letting out of contracts for the construction of a railroad to the lowest bidder would always be detrimental, to justify an allowance of much consideration to the argument made upon that assumption. It is conceivable that railroad corporations might, at least in some cases, consult their best interests by so letting out contracts, and taking suitable guaranties for the performance of the work. Aside from this, the rule, that we must construe a contract in the light of the presumed intention to facilitate the enterprise, is designed to aid in the ascertainment of the meaning of the language employed, and does not authorize a perversion of it. It is assumed that, to let out contracts for the construction of a railroad, would be inconsistent with the interests of the enterprise, because it is necessary that there should be a judicious selection of such contractors as would execute the work with expedition, fidelity and skill; and that there must, therefore, be a discretionary authority to reject bids, although the most favorable in amount. Now, if the plaintiff has such an authority in reference to the defendant's bid, the provision giving him a right to bid off a contract at public letting is annulled. He cannot have a right to take a contract by bidding it off, and the plaintiff at the same time have a right to reject his proposal, although the most favorable in its terms. If the plaintiff has such a

right, the defendant might be ready and willing to take a contract, and might propose to do it on the most favorable terms; and yet always have his proposal rejected by the plaintiff, in the exercise of its discretionary authority. The plaintiff has stipulated with the defendant that he may discharge his debt by taking a contract, and it would be alike unjust and inconsistent with that stipulation to allow to the plaintiff the discretionary authority to reject the defendant's proposal, upon the ground of his unsuitableness to do the work, and yet coerce the payment of the debt in money. The plaintiff has agreed that the defendant may discharge his debt in work, and it cannot now say he is unfit for the task. Thus it appears, that the argument drawn from the presumed policy of allowing the plaintiff the discretionary authority of rejecting the proposals of persons deemed unfit, leads to a conclusion inconsistent with the clear right of the defendant under the contract, and cannot therefore be maintained.

It may be argued, that the labor and expense of railroad grading depends upon the character of the earth to be removed from, and to be carried on to the road bed; that this cannot be determined, except as the strata are exposed in the progress of the work; that therefore it is customary and necessary for railroad companies to let out contracts at so much per cubic foot for the different kinds of earth; that in so letting out contracts, it is impossible to tell which one of various bids is the lowest, because it cannot be known how much of the different kinds of earth will have to be removed; and that, for those reasons, it would be unreasonable to attribute to the parties a design to have a public letting to the lowest bidder. This argument assumes, that the track of the railroad cannot be such that contracts might be prudently taken and awarded for the doing of the grading at so much for a given distance. This assumption we are not authorized to make. If the parties have agreed that contracts are to be bid off, the presumption is a fair one, that they have done so with the knowledge necessary to determine upon

the practicability of executing it. At all events, this court is not authorized to make and enforce a new contract for them, even though it might find the one actually made difficult or impossible of accomplishment.

It may be that it is customary with railroads to receive proposals to grade different sections of the road, at so much per cubic foot for removing and filling in the various kinds of earth, and to select from among the different proposals that which, taking into consideration the different prices proposed for the various kinds of work, and the probable amount of each of the different kinds of work to be done, the corporation may suppose most favorable. If such be the customary mode of letting contracts for grading, we cannot suppose that the parties to the contract in this case intended to adopt it. Under that mode of awarding contracts, they are not necessarily let to the lowest bidder, but to him whom the corporation may suppose or conjecture to be the lowest bidder. If a proposer or bidder gets a contract under that system, he does it because, in the exercise of the judgment of others, he is the most favorable bidder. He does not know who are his competitors, or what were their bids, or the considerations which influenced the judgment in awarding the contract. If that plan of letting contracts were adopted, whether the defendant would ever get a contract would depend upon the irresponsible and privately exercised judgment of his adversary; and if he knew what the competing bids were, he could not tell whether his was the best bid until the work was done. The defendant has provided for himself, by the terms of his subscription of stock, a right to have a contract because he bid it off at a public letting, and not a right to have it or not as the irresponsible judgment of the adverse party, exercised in private, and in reference to competing bids unknown to him, may determine. It is thus evident that the mode of awarding contracts, which I have admitted may be customary with railroads, could not have been adopted consistently with the contract; and I cannot therefore

suppose, that such mode was contemplated when the stock was subscribed. When a custom is proved, it is not received in evidence for the purpose of varying a contract, but for the purpose of showing what the contract was.

The clause of the contract provides, that the plaintiff would arrange, as far as it could consistently with the preceding provisions, that subscribers through whose land the road ran should be accommodated with work on their premises. This clause cannot control the construction of those going before, because it is expressly subordinated to them. The defendant had an absolute right to take a contract by bidding it off. This right could best be exercised, and could only be protected, through an auction. For this reason, and for the other reasons which I have given above, I think the plaintiff has no right to collect the defendant's subscription of stock, until it has afforded to him an opportunity of bidding off a contract at public auction. In my opinion, the meaning of "public letting," construed in connection with the accompanying words, is *public auction*. I think the court erred in giving the second charge, and in the ninth refusal to charge; but my brethren both differ from me.

[7–8.] There was no error in the 8th, 6th and 10th refusals to charge as requested. The contract does not impose upon the corporation the duty of giving actual notice of the letting contemplated. It would be sufficient if it gave the public notice usual in such cases. Nor does the contract impose upon the plaintiff the duty of adhering to a location made at the time when the contract was entered into. There is nothing in the contract which would authorize a release of the defendant for the cause specified in the tenth refusal to charge.

The majority of the court disagree with me as to the only point upon which I think there was error in the rulings of the court below. There must, therefore, be an affirmance.

STONE, J.—A majority of the court are not able to agree with the chief-justice, in his construction of the

phrase, "bidding off the same at public letting." While we concede that a letting of railroad contracts by oral outcry, and to the lowest bidder, pursuant to public proclamation, would be a *public letting*; yet we do not think that the only mode in which a letting may be public.

The word *letting*, when used in this connection, is an americanism. As defined by Mr. Webster, it is "the putting out of portions of work to be performed by contract, as on a railroad." There is, evidently, nothing in the word letting, which requires the putting out to be by public outcry. It simply means a putting out of the contracts, or engaging contractors to do the work. If this word stood alone in this contract, all would concede that the corporation might comply with its terms, without public outcry. This word seems to have been employed in this sense, in the act " to establish a board of commissioners for the improvement of the navigation of the Coosa river, and for other purposes," (Pamph. Acts of 1837, p. 13 ;) and in the act " for the preservation of the State capitol, and the grounds belonging to the same," Pamph. Acts 1847–8, p. 439.

The adjective, *public*, has many significations. None of them, in our judgment, implies that kind of publicity, proclamation, which attends sales at public outcry. The definition which, we think, expresses the intention of the parties to the present contract is, "*open to all—notorious.*" To become notorious, it is necessary that fair and reasonable public notice shall be given. To render the letting *open to all*, it is necessary that the public shall have the equal privilege of bidding for the contracts, and becoming contractors for the work. The letting which furnishes this notoriety, and secures to the public equal competition, is a public letting. On the other hand, no matter how many persons may have notice of, and be present at the letting ; and no matter how public the *act* of letting, or putting out the contracts may be—unless the letting be so conducted as to secure to the public an equal right to bid for and take the contracts, the subscriber who is denied this privilege, may justly complain that there has

not been extended to him the right to take contracts *by bidding off the same at public letting.*

In coming to these conclusions, we do not shut our eyes to the nature of the work to be performed, and the character of bids and contracts which experience has demonstrated to be promotive of success in such enterprises. In common with all men, we must be presumed to have knowledge of the leading practical principles which obtain in the construction of these public works.

The defense relied on in the circuit court, as we understand the record, raises but a single question on the feature of the contract above discussed. It contends that the letting should have been at public outcry. It is not anywhere contended that the publication was not sufficient, nor that Mr. Eppes was denied the right to compete fairly with the public for contracts to do work. In the charges given, and in the refusals to charge on this point, the circuit court took the view of this contract which we have taken; and we think the record, on the matter of the *public letting,* is free from error.