**Hugh COLLINS, et al., Plaintiffs,**

v.

**INTERNATIONAL DAIRY QUEEN, et al., Defendants.**

**No. 5:94–CV–95–4 (WDO).**

United States District Court, M.D. Georgia, Macon Division.

May 6, 1999.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon GA, Dianne Green Smith, Lee Abrams, Chicago, IL, for plaintiffs.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Macon, GA, William L. Killion, Quentin R. Wittrock, Troy A. Bader, Minneapolis, MN, for defendants.

## ORDER

OWENS, District Judge.

### Cups and Lids—Summary Judgment

In this antitrust class action commenced April 5, 1994, plaintiffs Dairy Queen franchisees contend that defendants International Dairy Queen, Inc. ("IDQ"), and its wholly owned subsidiary, American Dairy Queen Corporation ("ADQ"), have not only violated the antitrust laws of the United States but have also breached the March 13, 1974 consent decree of the United States District Court for the Middle District of Tennessee in the civil class action entitled *Poole v. International Dairy Queen, Inc. and American Dairy Queen Corp.*, Civil Action No. 6719. Defendants vigorously deny that they in any way have violated the antitrust laws or the terms of the *Poole* consent judgment.

Both the plaintiffs and the defendants, pursuant to Rule 56 of the Federal Rules of Civil Procedure, have moved the court for summary judgment on all *Poole* issues. They agree that summary judgment is appropriate because there is no material issue of fact in dispute relating to this subject. Summary judgment, as they further suggest, is particularly appropriate because the construction and interpretation of an unambiguous consent judgment contract is a matter of law for the court. *Sims' Crane Service, Inc. v. Reliance Insurance Co.*, 514 F.Supp. 1033 (S.D.Ga. 1981); *Board of Regents of the University of Minnesota v. Royal Ins. Co. of America*, 517 N.W.2d 888, 891–92 (Minn.1994). In addition, the plaintiffs note that the court under Minnesota law determines whether or not that contract has been breached. *Simeone v. First Bank National Assn.*, 971 F.2d 103, 106 (8th Cir.1992).

The 1974 *Poole* consent decree is between a plaintiff class of franchisees, then holding the right to sell products under the "Brazier" trade name, and franchisor American Dairy Queen Corporation. Among other things, the consent decree states that "[t]he provisions set forth below shall be in addition to all other rights set forth in any existing agreements between FRANCHISOR and FRANCHISEE." Defendants as a matter of policy have afforded all subsequent franchisees— now totaling about 5,500—the benefit of those provisions.

The dispute is over the acquisition of cups and lids required to be used in tremendous quantities by every Dairy Queen

franchisee. Pertinent to this dispute are the following portions of the *Poole* consent judgment:

### STANDARDS, SPECIFICATIONS AND SOURCES OF SUPPLY

FRANCHISOR agrees to the following set of guidelines and procedures governing product standards and specifications and sources of supply:

1. *Standards and specifications* —
With respect to certain major or principal products required to be utilized by FRANCHISEE in operating his outlet, FRANCHISOR agrees to establish detailed standards and specifications; and with respect to certain other complementary products, FRANCHISOR will designate brands and types of products as a standard of comparison.

(a) *Major Products* —FRANCHISOR agrees to establish reasonable, detailed specifications for mix, meat products, potatoes, and paper products (other than cups and lids) . . .

\* \* \* \* \* \*

(c) *Cups and Lids* —With respect to cups and lids, FRANCHISOR has established and will continue the procedure of requesting manufacturers to submit on an annual basis proposals for making cups and lids in accordance with FRANCHISOR'S specifications for use in "Dairy Queen" and "Dairy Queen/Brazier" stores. The proposals from manufacturers will set forth the price and terms under which the manufacturer is prepared to sell cups and lids to FRANCHISEES. If FRANCHISOR deems it to be in the best interest of its FRANCHISEES to advise manufacturers that approval will be limited to two (2) manufacturers capable of fulfilling the requirements of FRANCHISEES in accordance with FRANCHISOR'S specifications, FRANCHISOR shall be permitted in its judgment to limit manufacturers of cups and lids to not less than two (2) such manufacturers. FRANCHISOR agrees that it will not accept any payment or anything of value from any manufacturer of cups and lids approved by reason of, or based on sales by, any such manufacturer to any FRANCHISEE, a policy which FRANCHISOR has enforced in the past and will continue to strictly enforce in the future.

The "proposal" that by this language manufacturers are to be requested to submit on an annual basis is supposed to be an offer by the submitting manufacturer to make or produce Dairy Queen cups and lids, setting forth the price and terms for sale by the manufacturer to franchisees and/or the independent warehouses [1] that distribute approved products to franchisees. That "proposal" means an "offer" to sell is confirmed by the Black's Law Dictionary definition of "proposal," to wit:

An offer; something proffered. An offer, by one person to another, of terms and conditions with reference to some work or undertaking, or for the transfer of property, the acceptance whereof will make a contract between them. *Eppes v. Mississippi, G. & T.R. Co.*, 35 Ala. 33. Signification by one person to another of his willingness to enter into a contract with him on the terms specified in the offer. *Salisbury v. Credit Service*, Del.Super., 199 A. 674, 681.

(*See* Black's Law Dictionary, 4th Ed. at 1383), and by the similar definition of "proposal" in Webster's New International Dictionary, Second Unabridged Edition, to wit:

1. A proposing, or setting forth for consideration; statement; as, the proposal of his views.
2. Something proposed for consideration or acceptance; an offer, as of terms or conditions of agreement or of marriage; a scheme, a plan, a bid, or the

---

1. The parties agree that *Poole* contemplates proposals to sell to either franchisees or independent warehouses.

like, formally submitted; as, to listen to the committee's proposals; to have had many proposals in her youth.

\*    \*    \*    \*    \*    \*

*See* Webster's New International Dictionary, Second Unabridged Edition at 1085.

Can a manufacturer, in response to the invitation to submit a proposal for sale of cups and lids to franchisees and/or independent warehouses, be invited by franchisor ADQ/IDQ to submit a proposal for sale of cups and lids to franchisor ADQ and/or IDQ instead of to warehouses and/or franchisees? The plain language of subparagraph (c) neither directly nor indirectly mentions the submission of proposals to sell cups and lids to franchisor ADQ/IDQ. *Poole* therefore contemplates, therefore requires, that the invitation be for manufacturers to submit proposals to sell cups and lids only to franchisees and/or independent warehouses. It does not contemplate franchisor seeking proposals for manufacturers to sell cups and lids to franchisor ADQ/IDQ.

Assuming the submission of two or more proposals from manufacturers ready, willing and able to manufacture, sell, and deliver cups and lids to franchisees or independent warehouses for specified prices and terms, what does the third sentence of sub-paragraph (c) require of franchisor? It plainly states:

> If FRANCHISOR deems it to be in the best interest of its FRANCHISEES ... FRANCHISOR shall be permitted in its judgment to limit manufacturers of cups and lids to not less than two (2) such manufacturers....

"Not less than two" obviously and unequivocally means if possible there must be not less than two manufacturers approved by franchisor—there can be more, but there must be at least two. It is therefore the intent of *Poole* that franchisor, acting in the best interest of franchisees and not in franchisor's best interest, will approve not less than two manufacturers "capable of fulfilling the requirements of FRANCHISEES in accordance with FRANCHISOR'S SPECIFICATIONS...." Each of the two or more approved manufacturers must have the capacity to manufacture and sell a substantial part of the cups and lids needed by Dairy Queen franchisees and/or independent warehouses.

In summary, *Poole* thus requires:

(1) That franchisor American Dairy Queen Corp. and/or International Dairy Queen, Inc., establish specifications for all cups and lids to be used in Dairy Queen franchised stores.

(2) That franchisor ADQ and/or IDQ annually invite manufacturers capable of manufacturing and selling those cups and lids to submit proposals for making and selling those cups and lids to franchisees and/or independent warehouses, each proposal to set forth the price and terms of sale of cups and lids to franchisees and/or independent warehouses.

(3) That the proposals are to be evaluated by franchisor ADQ and/or IDQ, and at least two proposals offering franchisees and/or independent warehouses the best prices and terms will be approved by franchisor. In exercising its responsibility, franchisor is to act in the best interest of its franchisees and/or independent warehouses and not in its own best interest.

(4) That franchisor ADQ and/or IDQ is to then notify every franchisee and independent warehouser of the two or more manufacturers whose proposals have been approved for the coming year and of the prices and terms on which each approved manufacturer will sell cups and lids to each franchisee and/or independent warehouse.

(5) That franchisees and/or independent warehouses will then be permitted to purchase cups and lids directly from each approved manufacturer pursuant to that manufacturer's proposal, without franchisor ADQ/IDQ being a party to or involved in any way in the transaction.

### Payments to International Dairy Queen, Inc. and American Dairy Queen Corp. by Manufacturers

█ The last sentence of sub-paragraph (c) states:

FRANCHISOR agrees that it will not accept any payment or anything of value from any manufacturer of cups and lids approved by reason of, or based on sales by, any such manufacturer to any FRANCHISEE, a policy which FRANCHISOR has enforced in the past and will continue to strictly enforce in the future.

Plaintiffs contend that two manufacturers of cups and lids have paid ADQ/IDQ large amounts of money calculated as a percentage of sales by the manufacturer to the independent warehouses and that such payments were prohibited by the above language. Defendants respond, contending that defendants have legitimately been buying cups and lids from a manufacturer and have then been selling them to the warehouses, making a profit on those sales. The money received from manufacturers, they say, is their earned profit. *Poole,* they further contend, doesn't prohibit defendants from profiting on their sales of cups and lids.

The undisputed facts show that before this lawsuit commenced defendants ADQ/IDQ invited manufacturers annually to submit proposals for manufacturing and selling Dairy Queen cups and lids without indicating the quantities of cups and lids to be bid upon and without advising that the proposal was to set forth "the price and terms under which the manufacturer is prepared to sell cups and lids to FRANCHISEES. . . ." The proposals, when received, were viewed and considered by defendants not as offers to sell to franchisees and/or independent warehouses, but instead as the beginning point for negotiations for two manufacturers to sell to franchisor ADQ/IDQ the cups and lids to be sold to all warehouses and their franchisee customers during the coming year. As a result, each approved manufacturer and ADQ/IDQ agreed:

(1) Independent warehouses would be told to order their double poly cups and lids from one manufacturer—Continental/Imperial Bondware—and paper cups and lids from a second manufacturer— Lily–Tulip/Fort Howard. A price to be paid the manufacturer, to which was added between eight and twelve per cent to be paid to ADQ/IDQ was agreed upon. Warehouses were advised only of the total price, and were not privy to the portion of that price going to franchisor ADQ/IDQ.

(2) Each manufacturer, in response to the warehouse's order, would ship or deliver the cups and lids directly to the ordering warehouse, notifying ADQ/IDQ of the order and shipment.

(3) ADQ/IDQ would send an invoice for the order and shipment to the warehouse; the invoice price to the warehouse was the total of the price that had been agreed upon in negotiations between the manufacturer and ADQ/IDQ plus ADQ/IDQ's percentage markup.

(4) Sometimes the warehouse would pay the manufacturer the total invoice, and the manufacturer in turn would pay ADQ/IDQ its eight to twelve percent. At other times the warehouse would pay ADQ/IDQ the total invoice, ADQ/IDQ would deduct its eight to twelve percent, and then ADQ/IDQ would pay the manufacturer the original negotiated price. Either way, ADQ/IDQ received between eight and twelve percent of the invoiced amount.

(5) Neither ADQ nor IDQ would ever take possession of any cups and lids ordered by warehouses.

(6) Franchisees would order their cups and lids from the independent warehouses, but could not order directly from manufacturers.

As the plaintiffs suggest and the undisputed facts show, since at least 1984 ADQ/IDQ has received percentages of sales payments directly or indirectly from warehouses ordering cups and lids from Imperial Bondware and Lily–Tulip. The plain language of *Poole* prohibits such payments.

*Poole,* as thus construed, has been breached by defendants ADQ/IDQ in at least the following ways:

(1) By defendants failing to request manufacturers to submit on an annual ba-

sis proposals for making Dairy Queen cups and lids, such proposals to include the price and terms of proposed sale to franchisees and/or independent warehouses.

(2) By defendants acting in their own best interest to approve manufacturers, for the purpose of then negotiating for ADQ/IDQ to supposedly buy and sell all cups and lids to the warehouses.

(3) By defendants structuring warehouse purchases of cups and lids to permit ADQ/IDQ to receive eight to twelve percent of manufacturers' sales to warehouses.

(4) By approving Lily–Tulip as a manufacturer of double poly cups, knowing Lily–Tulip had no intention of manufacturing and selling double poly cups.

(5) By not approving at least two manufacturers who were ready, willing and able to manufacture and sell the Dairy Queen cups and lids.

(6) By directly or indirectly receiving payments of eight to twelve percent of cups and lids sales from manufacturers.

Defendants have repeatedly insisted that they have the right to earn a profit from the sale of cups and lids. The court's conclusion that ADQ/IDQ has breached *Poole* is not to be construed as a complete prohibition against their profiting from cups and lids sales. After they have first fully complied with the requirements of *Poole*, ADQ/IDQ are then free to generate profits in any manner not prohibited by *Poole*, such as by purchasing cups and lids from the manufacturers and offering them for resale as an additional source of supply for the franchisees.

### Georgia 301JJ Franchise Agreement

■ Some of the plaintiffs operate under Dairy Queen franchise agreements that are known as Georgia 301JJ franchise agreements and that contain the following:

The Company and Licensee recognize that, in order to preserve the competitive position of the Licensee it is essential that the Licensee obtain goods and services at competitive prices. To this end, the Company agrees to use its initiative to provide, where reasonably [sic] possible, alternate sources of supply for Licensee so as to promote competitive pricing. This is an affirmative obligation in addition to the obligation of the Company to consider requests of Licensee for approval of specific alternate sources of supply and to cooperate with Licensee in this regard.

Plaintiffs 301JJ franchise holders contend that defendants have also breached the covenant made with them "to promote competitive pricing." Defendants in response urge the court to find there is no evidence that defendants have done anything other than comply with the 301JJ commitment.

As already construed, the *Poole* consent judgment sets forth specific conduct required of defendants. The 301JJ agreement, by contrast, sets forth only a general contractual obligation "to promote competitive pricing." While the parties say, and the court agrees, that as to *Poole* there is no issue of material fact on the question of how the *Poole* covenants have been breached, there is, in the court's considered judgment, an issue of material fact to be submitted to a jury for decision on the question of how and to what extent the 301JJ promises have been violated.

Let summary judgment therefore be **GRANTED** for the plaintiffs on the issue of liability for breach of the obligations of Poole, and let summary judgment be **DENIED** both plaintiffs and defendants on the issue of compliance with the contractual obligations of the 301JJ, leaving for a jury the question of damages and attorneys fees to be awarded plaintiffs.